Terrell McGINNIS, Plaintiff,

v.

INGRAM EQUIPMENT COMPANY, INC., Defendant.

Civ. A. No. 87–C–0276–S.

United States District Court,
N.D. Alabama, S.D.

April 22, 1988.

Janine R. Pearson, Birmingham, Ala. (Court-appointed), for plaintiff.

A. Eric Johnston, Seier, Johnston & Wallace, Birmingham, Ala., for defendant.

## MEMORANDUM OPINION

CLEMON, District Judge.

Two years ago, defendant Ingram Equipment Company, Inc. ("the Company") discharged plaintiff Terrell McGinnis, a black man. McGinnis subsequently brought this action, claiming that he was subjected to discriminatory conditions of employment and eventually discharged because of his race. By a preponderance of the evidence adduced at trial, McGinnis has proved his claims. He is entitled to the appropriate equitable relief.

H.D. Ingram, Jr., is the owner and manager of the Company. Located in Jefferson County, Alabama, the Company sells and services refuse collection equipment (i.e., garbage trucks) and parts. It purchases used garbage trucks, cleans, rebuilds, and paints them; then offers them for resale to customers in Alabama, Mississippi, Tennessee, and Florida. The Company is fairly small—it has not employed fifteen workers on each working day in any relevant twenty-week period.[1]

The production work of the Company basically is done in its Shop Department. During the times relevant to this action,[2] a maximum of six employees have

1. Plaintiff brought this action under the 1964 Civil Rights Act, 42 U.S.C. Section 2000e et seq. ("Title VII"), as well as the Civil Rights Act of 1866, 42 U.S.C. Section 1981 ("Section 1981"). Under Title VII, the Company is not an "employer" within the meaning of 42 U.S.C. Section 2000e(b); therefore, the Court lacks jurisdiction under the former statute.

2. The statute of limitations for Section 1981 actions in Alabama is six years. *Miller v. Hall's Birmingham Wholesale Florists,* 640 F.Supp. 948 (N.D.Ala.1986). The Section 1981 claim was filed herein on July 8, 1987.

comprised this department. The operations of the Shop Department are coordinated by a shop foreman. The shop foreman deals directly with customers, completes the papers relating to the restoration and servicing of the trucks by the department, and supervises the work of the mechanics. In addition to mechanics, shop department employees include welders, painters, and mechanic helpers.

■ Terrell McGinnis applied for employment at the Company on September 29, 1981. He was interviewed and hired on the same day by H.D. Ingram. Although he did not so indicate on his application form, McGinnis had prior experience and training both in welding and automobile mechanics. McGinnis told Ingram of this experience; Ingram initially gave him the job of mechanic helper, and assigned him to work as a mechanic.

Joe Shields, Jr. was the shop foreman when McGinnis commenced his employment. Shields left the Company in October, 1981. Although Richard Windsdor was hired in as a mechanic two months later, he proved to be an unreliable employee—often arriving late for work.[3]

In January 1982, principally because McGinnis was the only reliable mechanic familiar with the operations of the shop, Ingram promoted him to shop foreman.[4] McGinnis performed the duties of this position in a thoroughly satisfactory manner. By April, Ingram had hired Leo Salser as a mechanic. Salser was groomed to replace McGinnis; and by the first of June, Ingram removed McGinnis and gave the job to Salser.[5] In notifying McGinnis of the displacement, Ingram said to him, "My company is beginning to grow, and it just don't [sic] look right for me to have a nigger foreman with all my white customers."

McGinnis thereafter dutifully oriented Salser to the job of shop foreman.

In the meanwhile, McGinnis reverted to the job classification of helper, though he continued to work as a mechanic when needed. As new mechanics and welders were hired, McGinnis oriented them to their new jobs.

As found earlier, McGinnis worked as a mechanic between his varied other duties at the Company. Like the regular welders, he had his personal tool box on the premises; and he performed his duties as a mechanic in a completely satisfactory manner.

Despite his official job classification of mechanic helper, McGinnis frequently functioned as the Company's janitor and general flunky. The only black employee of the Company, he alone had the task of keeping the restrooms cleaned and keeping black visitors out of them.[6] He alone had the duty of keeping the personal car of Mrs. Ingram and the salesmen washed and cleaned. And while some of the white shop employees sometimes steam cleaned a garbage truck, McGinnis regularly and consistently was required to steam clean trucks outside the building and often in the rain and the cold of winter.

Ingram knew that McGinnis had respiratory problems, but he required McGinnis to drive trucks without heaters long distances during winter months. After one such trip, McGinnis contracted pneumonia, which resulted in his hospitalization.

Ingram also required McGinnis to spray paint vehicles, notwithstanding his knowledge that the inhalation of paint fumes exacerbated McGinnis' lung disease. McGinnis was additionally required to siphon diesel fuel from vehicles—which again was deleterious to his health. The medical evidence reflects that between

---

3. Windsdor was fired in the spring of 1982 because he "1. would not come to work on time, [and] 2. refused to punch [the] time clock." DX 26.

4. McGinnis was not given a pay raise when he became shop foreman.

5. Salser had acquired three months of experience as a mechanic prior to his employment by

the Company. He had no other "experience, skills, or qualifications" when he applied for employment.

6. Occasionally, black truckdrivers would deliver or pick up trucks at the Company. Ingram gave a standing directive to McGinnis: "When the niggers come in, don't let them use the bathroom. Tell them it's out of order."

1982 and 1984, McGinnis' severe lung disease became progressively worse.[7]

On one occasion, a new wire welding machine was installed in the shop. A representative of the welding manufacturer came to train employees on the machine; but Ingram gave McGinnis a broom in response to the latter's request for training and said, "All I want you to do is keep the dust off [the welding machine]."

On another occasion, a garbage truck was delivered to the Company with a load of dead chickens, and these chickens had to be removed from the dumpster before the truck could be serviced. Ingram assigned this job to McGinnis. While removing the carcasses, McGinnis became ill and had to leave the job for the rest of the day. When he reported back to work the next day or so, he discovered that none of the white workers had been given the job in the interim; thus he was required to complete this fetid assignment.

The Company sponsors an annual Christmas Dinner for its employees at a local restaurant. In 1982, the dinner was held at Fifth Quarter Restaurant in Vestavia Hills—an affluent suburb of Birmingham. When McGinnis and his wife arrived, Ingram directed them to sit at the rear of the room, presumably so that they would not be seen by the white patrons. The white employees and their spouses were not directed to specific seats.

McGinnis sometimes drove Ingram to sell and/or deliver various equipment. On a trip to Montgomery, Alabama, Ingram required McGinnis to stop the vehicle on the shoulder of I–65 between the last Prattville Exit and the Alabama River, alongside a large cotton field. When the truck was stopped, Ingram told McGinnis, "Get out and go get your sack. You know y'all are professionals." McGinnis actually got out of the truck and actually started walking towards the nearest exit. Ingram stopped him, and said that he had only been joking.

On another trip, Ingram bought a barbecue sandwich for McGinnis when they stopped for lunch at a restaurant. Instead of placing the sandwich on the table, Ingram placed it on the floor and said to McGinnis, "Here you go, my nigger." All of the patrons of the restaurant were whites. Again, Ingram later apologized for this conduct.

On several occasions McGinnis suffered actual physical abuse at the hands of Ingram. On a trip to Springfield, Florida in 1985, after wrongly accusing McGinnis of lying about the condition of a truck being sold, Ingram kicked McGinnis in a fit of anger.

In November, 1986, Ingram again kicked McGinnis after blaming him for having picked up the wrong valve from a parts store. Ingram later discovered that McGinnis was not responsible for the error, and he apologized and gave him two football tickets. In the meantime, the swelling and extreme pain resulting from the kick had required medical attention.

On Monday, March 24, 1986, McGinnis was sent by Ingram to transport certain equipment between Tishimingo, Mississippi and Tuscaloosa, Alabama and to collect payment for it. Because of an unanticipated delay by others in loading the equipment in Mississippi, McGinnis was late in delivering it to Tuscaloosa and he did not arrive back in Birmingham until late that night. Upon his arrival and before he could explain anything, H.D. Ingram accosted him, saying, "Nigger, where's my damn check? You black s-o-b, you can't do nothing I tell you to do." McGinnis gave Ingram the check; but Ingram shoved him pulled a gun and pointed it at his head. He then said, "You're gonna do what I tell you to do and say what I tell you to say to my customers." McGinnis simply threw up his hands and said, "Yes sir, yes sir."

Two days later, Ingram told McGinnis to take the truck, go to a parts store and pick up a battery. McGinnis complied with the directive, but he reminded Ingram that he was hired as a mechanic helper rather than a truck driver. When he returned, Ingram suspended him for two days, ostensibly for

---

7. McGinnis was a smoker in 1983; the evidence does not disclose whether he continued to smoke after his malady was diagnosed. The Court infers that he did not.

"bad attitude" and abusing the company truck.

At the end of this suspension period, upon his return to work, Ingram told McGinnis that he was being discharged for the same reasons.

McGinnis was replaced by a white male.

During McGinnis' tenure with the Company, Ingram refused to consider black applicants for employment.

After discharging McGinnis, Ingram disingenuously fabricated certain "Report[s] of Work Incidents" and placed them in McGinnis' personnel file. These reports purport to document specific and recurring incidents of absenteeism, poor performance, insubordination, and threats by McGinnis. These forms first appeared after McGinnis' discharge; and they were not used to report work incidents for any other employees prior to March, 1986.[8] Following his discharge, McGinnis was told by a white employee that Ingram was placing derogatory information in his file. The fabricated Report of Work Incidents were later introduced into evidence in an attempt to perpetrate a fraud on the Court.

McGinnis diligently sought and obtained interim employment. For the balance of 1986, from six separate employers, he earned $3,774.58. In 1987, he earned $6,554.45. Through April 8, 1988, he has earned $3,080.00.

■ In the absence of racial discrimination, McGinnis would have remained shop foreman at the Company. He would have earned what his replacement, Leo Salser, earned during the relevant time period. He is entitled to prejudgment interest. *Davis v. Construction Materials*, 558 F.Supp. 697 (N.D.Ala.1983); *aff'd*, 720 F.2d 1293 (11th Cir.1983).

The following chart reflects the Company's backpay liability to McGinnis, based on an analysis of his actual or constructive earnings with those of Leo Salser.

| Period | 7/1/82–7/1/83 | 7/1/83–7/1/84 | 7/1/84–7/1/85 |
|---|---|---|---|
| Backpay | $6,015.65 | $ 7,776.23 | $10,244.26 |
| Interest* | 3,300.02 | 3,072.58 | 2,867.82 |
| Total | 9,315.67 | 10,848.81 | 13,112.08 |

| Period | 7/1/85–7/1/86 | 7/1/86–7/1/87** | 7/1/87–4/8/88 |
|---|---|---|---|
| Backpay | $ 9,766.62 | $20,954.66 | $12,956.16 |
| Interest* | 1,597.56 | 1,414.44 | 874.53 |
| Total | 11,364.18 | 22,369.10 | 13,830.69 |

GRAND TOTAL $80,840.53.

\* Interest is computed at the IRS adjusted prime rate.

\*\* Salser's actual earnings for the years 1986 and 1987 are undisclosed by the evidence. The Court infers that he earned no less in those years than he earned in 1985.

---

■ Although McGinnis presumptively is entitled to reinstatement, the Court finds that reinstatement is not in his best interest. If he were ordered to be reinstated, it is unlikely that Ingram would accord him the basic human dignity commanded by Section 1981. In light of the fabricated documents presented by the Company at trial, the Court finds that a reinstatement order would probably not be implemented in good faith and it reasonably can be expected that the Company would devise

8. The file of Richard Windsdor is illuminating. There, rather serious work incidents were written in long hand on a yellow sheet by H.D. Ingram and placed in Windsdor's file. There are no "Reports of Work Incidents" in his file. DX 26.

various pretexts by which to discriminate or retaliate against McGinnis because of his race. Since it is plaintiff's nature to acquiesce in, rather than to challenge, racially discriminatory acts by the Company, the continuing discrimination and/or retaliation may well escape the scrutiny of this Court. Finally, McGinnis already has suffered many more racial indignities at the hands of the Company than any one citizen should be called upon to bear in a lifetime. Reinstatement is inappropriate under these circumstances.

In lieu of reinstatement, the Court will require that the Company pay McGinnis the equivalent of three full years of backpay, based on the salary McGinnis would have earned at the Company during 1986, in the absence of discrimination (i.e., $25,107.96). Thus, plaintiff is entitled to $75,323.88 in front pay.

By separate order, the appropriate relief shall be granted.

### FINAL ORDER AND PERMANENT INJUNCTION

Based on the accompanying MEMORANDUM OPINION, it is hereby ORDERED, ADJUDGED, DECREED and DECLARED as follows:

1. Defendant INGRAM EQUIPMENT COMPANY, INC., discriminated against plaintiff TERRELL McGINNIS in violation of 42 U.S.C. Section 1981, by subjecting him to different terms and conditions of employment and discharging him because of his race or color.

2. Defendant INGRAM EQUIPMENT COMPANY, INC., its president H.D. INGRAM, JR., its officers, employees, agents and those in active concert or participation with them who receive actual notice of this Order are hereby PERMANENTLY ENJOINED from discriminating against plaintiff TERRELL McGINNIS and other black applicants and employees, because of their race, in the terms and conditions of their employment.

3. Plaintiff TERRELL McGINNIS shall have and recover of defendant INGRAM EQUIPMENT COMPANY, INC., a corpora-

tion, the sum of Seventy-five Thousand Three Hundred Twenty-three and 88/100 Dollars ($75,323.88) as front pay and Eighty Thousand Eight Hundred Forty and 53/100 Dollars ($80,840.53) as backpay and prejudgment interest—a total of One Hundred Fifty-six Thousand One Hundred Sixty-four and 41/100 Dollars ($156,164.41).

4. Plaintiff shall have and recover of defendant a reasonable attorney's fee and reimbursement of litigation expenses, to be hereafter set by the Court on motion of plaintiff in the absence of an agreement between the parties on the issue.

5. The costs of this action are hereby taxed against defendant, for which execution shall issue.